Filed 11/21/23  In re A.T. CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re A.T., a Person Coming Under the Juvenile Court Law. | |
| ORANGE COUNTY SOCIAL SERVICES AGENCY,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>R.T.,<br><br>    Defendant and Appellant. | G062686<br><br>(Super. Ct. No. 21DP0891)<br><br>O P I N I O N |

Appeal from an order of the Superior Court of Orange County, Vibhav Mittal, Judge.  Affirmed.

Pamela Rae Tripp, under appointment by the Court of Appeal, for Defendant and Appellant.

Leon J. Page, County Counsel, Karen L. Christensen and Aurelio Torre, Deputy County Counsel, for Plaintiff and Respondent.

No appearance for the Minor.

## INTRODUCTION

R.T., the mother of minor A.T., appeals from an order of the juvenile court terminating her reunification services. She asserts the Orange County Social Services Agency (SSA) did not provide her and her daughter A.T. with conjoint counseling early enough in the reunification process and the counseling eventually provided was inadequate. She also asserts her visitation was inadequate. The court should, she claims, have extended the reunification services period.

We affirm the termination order. Substantial evidence supports the juvenile court's conclusion that too much time had passed since A.T.'s detention (over 18 months) to allow reunification services to continue, in light of the lack of significant progress in the areas most concerning to the court and to SSA. The relationship between R.T. and A.T had not improved to the point where conjoint therapy would have a positive effect. As the record showed, the few sessions that took place simply cemented R.T. and A.T. in their respective opposing positions.

As for visitation, even R.T. recognized that a child of A.T.'s age cannot be forced to visit, at least not without extremely negative blowback. A.T.'s refusal to visit more frequently than she did arose directly from her mother's actions and attitudes both before and after detention. SSA provided the framework for visitation; A.T.'s decision not to use it fully reflects both the state of the parent-child relationship and her perception of having escaped a toxic environment.

## FACTS

A Huntington Beach police officer took A.T. and her three siblings into protective custody after A.T.'s older sister reported an incident occurring in August 2021 during which R.T. beat her with a broom handle, pulled her hair, and kicked and spit on her. Two of the other children, one of them A.T., witnessed this incident and corroborated the older sister's report. The children told SSA that R.T. routinely subjected

them to physical and verbal abuse. They all said they were afraid of their mother. The children were placed in Orangewood Children and Family Center.

A.T. was 13 years old at the time of detention. Her sister was 15, and her two brothers were 8 and 6. Both girls told SSA they wanted to live with relatives in Georgia instead of with their mother.

The court exercised jurisdiction over the children in October 2021. The services made immediately available to R.T. were individual counseling with anger management, a grief support group, and a parenting class. The court authorized six hours of monitored visitation.

The first visits between R.T. and the two girls in August 2021 were "'tense.'" A.T. and her sister told the social worker at first that they did not want to visit; they finally agreed to go if they could go together.

As of the end of September 2021, neither A.T. nor her older sister wanted to visit with R.T. They were placed in foster care together.

A visit in October led to "a lot of arguing" between R.T. and the two girls. A.T. told SSA that she did not talk to her mother during visits because "'she just talks about her work and her life is great without us.'" At the girls' request, the schedule became visits every other week, with R.T. acknowledging that "'I can't force them'" to visit. At a team meeting in March 2022, the girls complained that the visits were not going well. R.T. "dictates the visits" and "threatens to take away their phones." A.T. stated that talking to R.T. was "like talking to a brick wall." The girls did not want therapy with R.T.

R.T.'s individual counseling was not successful at first. The counselor reported that R.T. would discuss the reasons for her referral only reluctantly and tended

to "blame her daughter."[1] R.T. was "focused on working" at her cleaning business. Her counselor noted improvement in anger management and communication with the children and recommended further therapy and support for anger and relationship issues. As of April 2022, R.T. had completed 16 therapy sessions.

A.T. maintained throughout the entire reunification period that she did not trust R.T., did not want to reunify with her, and wanted instead to be placed with relatives in Georgia. A.T. had no interest in working out a relationship with R.T. Her therapist opined in September 2022 that it was in A.T.'s best interest to move to Georgia to live with relatives there. A team meeting in early September 2022 had to be held in two sessions because the children did not want to see R.T.

In September 2022, A.T.'s foster parent reported that "numerous visits" with R.T. had left A.T. "visibly upset."[2] Her mother "brought up past traumas, renewed old fights, talked about her appearance, etc." A.T. suffered from alopecia (hair loss), and both her foster parent and her doctor believed that stress caused the condition to worsen. After skipping most of the visits during the summer of 2022, A.T.'s emotional and psychological condition improved. As for R.T., the foster parent stated, "She may have completed court-ordered classes, but her nature and habits are unchanged. She routinely falls into patterns of verbal assault, belittlement, unacceptance, and in general strikes a tone of fear and anger in the girls."

A.T. and her sister visited their relatives in Georgia over the Christmas holidays, between December 22, 2022, and January 7, 2023. The visit went very well. When contacted by SSA about scheduling a video call with R.T. during the visit, A.T. stated, "'I don't want to, period.'"

---

[1] At one point, R.T. told her own mother that when she got all four of her children back, she would "'beat the dog shit'" out of the oldest child, because it was all her "fault" that the children were detained. R.T. told the oldest child to go to independent living because "'[y]ou and I are not good together," although she wanted to reunify with the other three children, including A.T.

[2] On one visit, R.T. told A.T. to "enjoy her time" with her older sister because when "this is over," the younger children would be moving to Arizona, while the older sister would be staying in California.

In November 2022, R.T.'s therapist gave SSA a discouraging report about her progress. She "doesn't want to acknowledge anger issues, she is in denial and has not work [*sic*] through those issues." When the therapist tried to address her anger, she became arrogant and told him "not to go there." She was "not taking any responsibility and regarding the physical abuse she has stated that 'family members are brainwashing her children and that Social Services is against her.'" But in December, the situation improved somewhat, and R.T. reportedly made "significant progress."

Having noted R.T.'s December improvement in her individual therapy, the court ordered conjoint therapy for R.T. and A.T. on January 9, 2023. This order was not immediately communicated to A.T., and she told SSA she was not interested in therapy with her mother. Her foster parent opined that forcing her to attend would cause emotional trauma. Her court-appointed special advocate reported that the prospect of conjoint therapy with R.T. caused her to break down in tears. A.T.'s therapist was skeptical about the benefits of conjoint therapy because A.T. "feels that [R.T.] can say all the right things that people want to hear, but then, [R.T.] will not change and will repeat previous behaviors towards her and her siblings." Nevertheless, A.T. agreed to give conjoint therapy a try.

In March 2023, SSA reported to the court that despite being encouraged to visit, both A.T. and her sister refused to do so. R.T. stated in March 2023 that she had come to terms with her two daughters not wanting to visit her. When asked how she could reunify with A.T. if she was not visiting, she replied that "God has show[n A.T.] being home with her and 'he never shows me something that will not happen.'"

As of March 13, 2023, A.T. and R.T. had had three conjoint therapy sessions. The therapist reported that R.T. logged on 30 minutes late to the second session, claiming that she had put down the wrong day. The therapist noted that the sessions had been at the day and time R.T. specified. "Her issues [*sic*] is that she has justification for what she did to the children." The therapist added that R.T. "has been

5

resistant in the whole process from intake to the most recent session." Whenever A.T. asked a question, R.T. "made an excuse or deflected." "The mother's resistance in conjoint therapy and refusal to engage with the child and the questions asked are concerning." The therapist stated that she did not see how A.T. could safely reunify with her mother.

R.T. criticized the therapist because she "ask[ed] personal questions that [R.T.] felt she did not need to address because she was already addressing things with her own individual therapist. [R.T.] reported that she feels that the family therapist sided with [A.T.] by inquiring of [R.T.] 'how do you feel about what your daughter has said.'"

Concerning conjoint therapy, A.T. told SSA that R.T. never asked about her school or her well-being. Instead she made many excuses about past events or made the topic completely about herself. The therapist even had to prompt her to say hi to A.T.

The 12-month review hearing, which finally got underway on March 20, 2023, became the 18-month hearing. By this time, A.T. had turned 14. The statutory time for reunification services had run out. A.T., two of the social workers, R.T.'s therapist, and R.T. herself testified.

On May 18, 2023, the court ordered R.T.'s reunification services as to A.T. terminated. It approved continued foster care for A.T. with a permanent plan of placement with a fit and willing relative.

The court found the trial testimony of R.T.'s individual therapist not credible. In contrast to the rosy picture of her progress he gave on the stand, a report from the end of November 2022 struck quite a different note. He told SSA in November that R.T. was "in denial" and did not want even to acknowledge anger issues, let alone work through them. He found anger management "difficult to address" with her because of her arrogance and her warning him not to "go there." Asking her questions meant he was "'intruding.'" She refused to take responsibility for the current situation or the prior physical abuse and contended that "'family members are brainwashing her children and

6

that Social Services is against her.'"  The bottom line, according to her therapist, was that R.T. "'is not able to provide appropriate parenting for her children.'"  The court noted the "striking similarity" between R.T.'s  individual therapist's assessment in November 2022 and the conjoint therapist's assessment four months later, in March 2023.

In addition, the court also considered A.T.'s unwavering decision that she did not want to reunify with R.T., or even to visit her.  It found A.T.'s fears regarding reunification credible.  It noted that conjoint therapy, even as late as January 2023, was premature and therefore unsuccessful.  The court could not find any basis for ordering additional reunification services beyond the 18-month cutoff date.

## DISCUSSION

**I.        Reasonable Services (Conjoint Therapy)**

We review a challenge to SSA's provision of reasonable services for substantial evidence.  (*In re Alvin R*. (2003) 108 Cal.App.4th 962, 971.)  "In making this determination, we review the record in the light most favorable to the court's determinations and draw all reasonable inferences from the evidence to support the findings and orders.  [Citation.]  'We do not reweigh the evidence or exercise independent judgment, but merely determine if there are sufficient facts to support the findings of the trial court.' [Citation.]"  (*Kevin R. v. Superior Court* (2010) 191 Cal.App.4th 676, 688-689.)

A finding that reasonable reunification services have been offered must be supported by "'clear and convincing evidence.'"  (*Robert L. v. Superior Court* (1996) 45 Cal.App.4th 619, 625, quoting *In re Monica C.* (1995) 31 Cal.App.4th 296, 306.)  Again, the standard of review is sufficiency of the evidence.  (*Id.* at p. 626.)  "[I]n reviewing the reasonableness of the reunification services provided . . ., we must also recognize that in most cases more services might have been provided, and the services which are provided are often imperfect.  The standard is not whether the services provided were the best that

7

might have been provided, but whether they were reasonable under the circumstances." (*Elijah R. v. Superior Court* (1998) 66 Cal.App.4th 965, 969.)

R.T. argues that SSA's delay in setting up conjoint therapy amounts to a failure to provide reasonable reunification services.[3] This long delay also was the basis of her request for additional reunification services beyond the 18-month cutoff date.

The court did not agree. It first noted R.T.'s defensiveness in her individual therapy as late as November 2022. Only after receiving a report of improvement on that score did the court order conjoint therapy in January 2023. As the court rightly perceived, there was no point to setting up conjoint therapy with someone who was going to tell the therapist not to "go there" when sensitive topics were introduced. Second, the three sessions of conjoint therapy that were conducted showed that R.T. had not made the progress that her individual therapist attributed to her in his December 2022 report or on the witness stand. She was still yelling and arguing – although this time with the therapist – she was still focused on herself, she was still unwilling to listen to A.T., and she was still convinced that people were "taking sides" against her.

A.T. testified that she did not feel conjoint counseling was doing her any good. She did not see any change in the way R.T. related to her; consequently her feelings of fear and belittlement were unchanged. Under these circumstances, conjoint therapy would not only be unsuccessful, it would likely convince A.T. that she was justified in refusing to have a relationship with her mother and in wanting to move to Georgia to live with relatives who would take proper care of her.

---

[3]     We note that R.T. never informed the court that SSA was dilatory about setting up conjoint therapy, which was an aspect of her original case plan. "No reason is apparent here why the general principle that a party should not sleep on her rights does not apply. [Citation.] If Mother felt during the reunification period that the services offered her were inadequate, she had the assistance of counsel to seek guidance from the juvenile court in formulating a better plan: '"The law casts upon the party the duty of looking after his legal rights and of calling the judge's attention to any infringement of them. If any other rule were to obtain, the party would in most cases be careful to be silent as to his objections until it would be too late to obviate them, and the result would be that few judgments would stand the test of an appeal." [Citation.]' [Citation]." (*In re Christina L.* (1992) 3 Cal.App.4th 404, 416.)

8

The court carefully considered the evidence of the reasonableness of the therapy services provided to R.T.  Given the resistance to the therapeutic process that she exhibited throughout most of the reunification period, the court had substantial clear and convincing evidence that, under the circumstances, the therapy on offer was reasonable.

**II.**　　　　　**Visitation**

Welfare and Institution Code[4] section 362.1, subdivision (a)(1)(A), provides that "[v]isitation shall be as frequent as possible, consistent with the well-being of the child."  The evidence in this case showed that visitation was not consistent with A.T.'s well-being.

"When a child refuses visitation, it is the parent's burden to request a specific type of enforcement, or a specific change to the visitation order.  Absent a request, it is not the court's burden to sua sponte come up with a solution to the intractable problem of a child's steadfast refusal to visit a parent."  (*In re Sofia M*. (2018) 24 Cal.App.5th 1038, 1046.)  R.T. made no such request to the court.

As R.T. herself acknowledged, a child of A.T.'s age cannot be forced to visit.  She even stated that she had resigned herself to A.T.'s desire not to visit and had put the matter in God's hands.

Dragging A.T. to a visit against her will would probably be counterproductive.  The most likely outcome would be resentment and further alienation.  Forcing A.T. to visit could not possibly repair the damaged relationship between her and her mother.  (See *In re Danielle W*. (1989) 207 Cal.App.3d 1227, 1238-1239 [harmful effects of forced visitation].)

The evidence in this case showed that when R.T. and A.T. did visit, the negatives far outweighed the positives for A.T.[5]  She and her mother argued.  R.T. brought up old fights and commented on A.T.'s appearance.  A.T. felt that her mother

---

[4]　　All further statutory references are to the Welfare and Institutions Code.

[5]　　"[R.T.] just talks about her work and her life is great without us."

9

concentrated on the two younger boys and ignored her. When A.T. visited, the stress exacerbated her alopecia. When she did not visit, her psychological and emotional state improved.

The purpose of visitation is to maintain or improve significant, positive emotional bonds so that the family can reunify. (See *In re Autumn H.* (1994) 27 Cal.App.4th 567, 575.) In this case, however, visitation just made things worse. The only bright spot – and the reason she agreed to visit at all – was that A.T. could see her brothers. But even that benefit came with a cost, as A.T. perceived her mother's favoritism toward them. The court had substantial clear and convincing evidence that the visitation offered to R.T. was reasonable under the circumstances.

## III.       Extension of Time for Services

R.T. asked the court to extend the hearing on reunification services past the 18-month cutoff period of section 361.5, subdivision (a)(3)(A), pursuant to section 352.[6] The court denied this request on the ground that it saw no basis for the extraordinary circumstances required for such relief. (See *Andrea L. v. Superior Court* (1998) 64 Cal.App.4th 1377, 1388-1389.) Moreover, relief under section 352 requires a finding that a continuance not be contrary to the child's interest. The court could not find that continuing reunification services was not contrary to A.T.'s interest.

We review the juvenile court's decision to deny a motion to continue a hearing for abuse of discretion. (*In re Gerald J.* (1991) 1 Cal.App.4th 1180, 1187.) We cannot find that the court abused its discretion in this case.

---

[6]       Section 352, subdivision (a)(1), provides, "Upon request of counsel for the parent, guardian, minor, or petitioner, the court may continue any hearing under this chapter beyond the time limit within which the hearing is otherwise required to be held, provided that a continuance shall not be granted that is contrary to the interest of the minor. In considering the minor's interests, the court shall give substantial weight to a minor's need for prompt resolution of his or her custody status, the need to provide children with stable environments, and the damage to a minor of prolonged temporary placements."

## DISPOSITION

The order terminating reunification services is affirmed.


BEDSWORTH, ACTING P. J.

WE CONCUR:


GOETHALS, J.


DELANEY, J.

11